UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,          Case No. 18-cr-20133

v          Honorable Thomas L. Ludington

BRANDON PUTMAN,

          Defendant.
_____/

**ORDER DENYING DEFENDANT'S MOTION FOR SPECIFIC PERFORMANCE AND DIRECTING SURREPLY ON GOVERNMENT'S MOTION IN LIMINE**

On the day of the final pre-trial conference, April 10, 2019, the parties each filed a motion. In the morning, the government filed a motion in limine. ECF No. 63. The government seeks to "exclude defense evidence, whether in documentary or testimonial form, offered to suggest to the jury that Brandon Putman was acting lawfully with regards to the auto sear that is the basis of the charges in the current indictment." The government's position is that, in order to prove knowledge, it must prove that Putman knew the essential characteristic of the drop-in-auto-sear, i.e. that it could be used to convert a semi-automatic firearm into a machinegun. The government contends that it need not prove that Defendant knew of the unregistered status of the firearm nor that he had specific intent to violate the law. Thus, according to the government, any good faith defense is irrelevant unless it negates Brandon Putman's knowledge of the essential characteristic of the drop-in auto sear. The government also argues that a defense of "entrapment by estoppel" should be excluded because it does not negate the Defendant's knowledge of the essential characteristic of the drop-in-auto sear.

The same afternoon, approximately 30 minutes prior to the final pretrial conference, Defendant filed a "motion for an order requiring the government's specific performance with the

terms of a January 22, 2019 pretrial diversion agreement." ECF No. 64. Defendant contends that he and the government reached an agreement under which Brandon Putman would take and pass a polygraph administered by BATF or FBI polygraph agent and, if he passed, charges would be dismissed, and Defendant would be placed in a pre-trial diversion program. Ephesians 610 (the family owned LLC) would plead guilty to possession of an unregistered firearm, and all adult Putman family members would surrender their FFL and SOT and never again apply for such licenses. The parties apparently understood that, as a condition precedent to the polygraph, Defendant would submit to a proffer interview, which he did.

During the final pretrial conference, the parties engaged in extensive discussion regarding this motion. The government contended that an implied pre-condition of the polygraph was a "truthful" proffer interview, and they decided that Defendant was not truthful, which entitled them to exit the agreement. Defendant, on the other hand, believed that the sole purpose of the proffer was to pose interview questions to Defendant to determine the inquiry for the subsequent polygraph examination. Moreover, Defendant contends that even if a "truthful proffer" was a condition precedent, it is unenforceable. Defendant argues that whether he was "truthful" is an inherently subjective determination. With no objective criteria to apply, the agreement was illusory because the government would have sole discretion to determine whether the condition precedent was met.

Another issue raised during the final pretrial conference was that Defendant submitted to a private polygraph examination arranged by his counsel. The government also believed that an implied condition precedent to their agreement was that Defendant not submit to a private polygraph examination prior to being polygraphed by the government's examiner. The government's position is that such private polygraph examinations constitute an improper practice

run, which negates the validity of the subsequent government administered polygraph examination. Defense counsel did not agree that there was any implied precondition that the Defendant not submit to a private examination, nor did he agree that any expert would support the notion that private polygraphs undermine the credibility of the government's subsequent polygraph exam. To the contrary, he contends that this is a common practice.

In sum, Defendant wants the benefit of his bargain. Having submitted to the government's proffer interview, he would like his opportunity to take a polygraph examination administered by the government and, if he passes, enter into a pre-trial diversion agreement (in addition to the other terms of the agreement, as set forth above).

Defendant also believes that he detrimentally relied on the government's promise when he submitted to the proffer interview by sharing information with the government that he would not have otherwise shared. He also contends that the government breached its agreement not to use the information obtained during that proffer interview for any purpose other than the subsequent government polygraph examination (which never occurred). Defendant believes that the government's motion in limine is supported by information the government learned for the first time during the proffer, such as the Defendant's intention to present certain good faith defenses and/or "entrapment by estoppel." The government contends that it was long aware of Defendant's intention to assert these defenses, as his counsel indicated as much during previous hearings and/or conferences, and that a June 2018 hearing transcript reflects that the government was already aware of some or all of these defenses prior to the Defendant's proffer interview.

A brief summary of the facts and the applicable law will be provided, after which the motions will be addressed.

**I.**

The following facts were set forth in the September 11, 2018, order taking the motions for joinder and motions in limine under advisement. ECF No. 42. The facts set forth in that order were derived from the exhibits attached thereto. Former Defendant William Putman operates a firearms business in Caro, MI, which holds a Federal Firearms License (FFL). His son, Defendant Brandon Putman, is also allegedly affiliated with the business. Defendants live in a shared residence along with twenty–six family members.

According to the Affidavit of ATF Agent Stephen Ross (Agent Ross), in mid–November 2017 Brandon Putman went to Progressive Tool and Machinery in Elkton, MI and asked the shop owner if he could make 10 duplicates of a specific part, which the shop owner suspected to be a drop in–auto sear ("DIAS" or "auto–sear")[1]. ECF No. 43 at pg. 18–31 (Ross Aff. ISO Warrant). The shop owner then contacted ATF. *Id.* Agent Ross met with the shop owner in December, 2017, and the shop owner gave Agent Ross the part in question. *Id.* The part was submitted to the ATF Firearms Technology branch for testing, which confirmed that the part was a DIAS. ECF No. 44. at pg. 2 (Report of Technical Examination). The shop owner gave ATF Brandon Putman's contact information. An undercover ATF Agent, posing as a machinist at the shop, contacted Brandon Putman and had several discussions with him concerning the part he wanted duplicated and the price per duplicate of $100.[2] ECF No. 44 at pg. 74–75, 105–115. (Investigation Reports – Undercover Contacts).

---

[1] A drop-in auto sear (DIAS) is a device which, when combined with other fire-control parts, can convert a semi-automatic AR-15 to fully automatic. Although a DIAS is in actuality a gun part and not a gun itself, a DIAS is legally considered a "machine gun" under 26 U.S.C. §5845(b).

[2] According to ATF, a registered, lawfully obtained DIAS would cost approximately $40,000. The government contends that Brandon Putman was attempting to cheaply obtain these DIAS duplicates. The original DIAS he brought to the machine shop was itself unregistered and did not contain a serial number. According to ATF, neither Brandon, William, nor Kacie Putman have a DIAS registered in their name or registered to Ephesians 610 LLC.

On February 28, 2018, an Indictment was returned charging Defendant Brandon Putman with one count of knowingly possessing a firearm not registered to him in the National Firearms Registry and Transfer Record, specifically a drop-in auto sear (DIAS), which is a machinegun under 26 U.S.C. §5845(b), in violation of 26 U.S.C. §5861(d). On April 11, 2018, a superseding indictment was returned charging Defendant Brandon Putman with one count of receiving a firearm (DIAS) made in violation of the law, pursuant to 26 U.S.C. §5861(c), one count of knowingly possessing a firearm not registered to him (DIAS) in violation of 26 U.S.C. §5861(d), and one count of knowingly possessing a firearm (DIAS) without a serial number, in violation of 26 U.S.C. §5861(i).

## II.

### A.

The NFA was originally enacted in 1934.[3] Similar to the current NFA, the original Act imposed a tax on the making and transfer of firearms defined by the Act, as well as a special (occupational) tax on persons and entities engaged in the business of importing, manufacturing, and dealing in NFA firearms. The law also required the registration of all NFA firearms with the Secretary of the Treasury. Firearms subject to the 1934 Act included shotguns and rifles having barrels less than 18 inches in length, certain firearms described as "any other weapons," machineguns, and firearm mufflers and silencers.[4]

The Federal Firearms Act of 1938 (FFA) imposed a federal license requirement on gun manufacturers, importers, and persons in the business of selling firearms. The term federal firearms

---

[3] National Firearms Act, Public Law 474, approved June 26, 1934.
[4] https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download

licensee (FFL) is used to refer to those on whom the license requirement is imposed. "FFL" is also used to refer to the license itself.[5]

The Supreme Court in 1968 held in the *Haynes* case that a person prosecuted for possessing an unregistered NFA firearm had a valid defense to the prosecution - the registration requirement imposed on the possessor of an unregistered firearm violated the possessor's privilege from self-incrimination under the Fifth Amendment of the U.S. Constitution.[6] The *Haynes* decision made the 1934 Act virtually unenforceable.[7]

Title II amended the NFA to cure the constitutional flaw pointed out in *Haynes*.[8] First, the requirement for possessors of unregistered firearms to register was removed. Indeed, under the amended law, there is no mechanism for a possessor to register an unregistered NFA firearm already possessed by the person.[9] Second, a provision was added to the law prohibiting the use of any information from an NFA application or registration as evidence against the person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration.[10] In 1971, the Supreme Court reexamined the NFA in the *Freed* case and found that the 1968 amendments cured the constitutional defect in the original NFA.[11]

In 1986, this Act amended the NFA definition of "silencer" by adding combinations of parts for silencers and any part intended for use in the assembly or fabrication of a silencer.[12] The

---

[5] *Id.*
[6] *Haynes v. U.S.*, 390 U.S. 85 (1968)
[7] *Id.*
[8] Gun Control Act of 1968, Public Law 90-618, approved October 22, 1968.
[9] *Id.*
[10] 26 U.S.C. 5848
[11] *U.S. v. Freed*, 401 U.S. 601 (1971)
[12] Firearm Owners' Protection Act, Public Law 99-308, approved May 19, 1986.

- 6 -

Act also amended the GCA to prohibit the transfer or possession of machineguns.[13] Exceptions were made for transfers of machineguns to, or possession of machineguns by, government agencies, and those lawfully possessed before the effective date of the prohibition, May 19, 1986. *Id.*

Section 922(o), Title 18, U.S.C., makes it unlawful to possess or transfer a machinegun, except for transfers to or possession by Federal and State agencies or the transfer or possession of a machinegun lawfully possessed before the effective date of the statute, May 19, 1986. So, machineguns "lawfully possessed" before the effective date are those manufactured before May 19, 1986 and registered in the NFRTR.[14] 18 U.S.C. 922(o) generally makes it unlawful to possess or transfer any machinegun, including a machinegun frame or receiver, manufactured after May 18, 1986. Exceptions are provided for weapons produced by a qualified manufacturer for sale to government entities, for sale to Federal and State agencies or to FFLs/SOTs as "sales samples" for demonstration to prospective governmental customers, or for exportation.[15]

**B.**

For a business entity such as a corporation, association, or partnership to qualify for a license, it must not have any person responsible for the management or policies of the firearms business under Federal disabilities, for example, felons.[16] Thus, the entity must list its "responsible persons" on the license application and provide ATF with the fingerprints and photographs of such responsible persons.[17]

---

[13] 18 U.S.C. 922(o)
[14] https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download at 45
[15] *Id.* at 46-47.
[16] 18 U.S.C 923(d)(1)(B); 27 CFR 478.47
[17] https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download at 80

It is common for employees of FFLs/SOTs to take firearms registered to the FFLs/SOTs off-premises for display, demonstration, or other purposes on behalf of their registered owners. *Id.* at 74. This does not result in the "transfer" of NFA firearms requiring ATF approval and registration of the firearms to the employees as long as the firearms are possessed for the employer's business purposes and not for employee's personal use. *Id.* Similarly, employees taking custody of firearms under these circumstances would not constitute a "firearms disposition" that is required to be recorded in FFL/SOT's acquisition and disposition records (A & D Records). *Id.* Although not legally required, ATF instructs FFLs/SOTs and their employees to consider taking the following actions as a matter of good business practice:

(1) Keep a copy of the NFA registration document with each registered firearm.

(2) If the firearm is located in an area having State or local registration requirements, keep a copy of the State/local registration document with the firearm. *Id.*

The NFRTR is the central registry of all NFA firearms in the U.S. which are not in the possession or under the control of the U.S. Government. The registry includes (1) the identification of the firearm, (2) date of registration, and (3) identification and address of the person entitled to possession of the firearm (the person to whom the firearm is registered).[18]

FFLs/SOTs qualified as importers must register imported firearms by filing ATF Forms 2, Notice of Firearms Manufactured or Imported, no later than 15 days from the date the imported firearms were released by Customs.[19] FFLs/SOTs qualified as manufacturers must register manufactured firearms by filing ATF Form 2, Notice of Firearms Manufactured or Imported.[20] For transfers by FFLs/SOT/s to persons other than FFLs/SOT's, transferors of registered firearms must

---

[18] 26 U.S.C. 5841(a)
[19] https://www.atf.gov/firearms/docs/atf-national-firearms-act-handbook-chapter-3/download at 25; *see also* 27 CFR 479.112
[20] https://www.atf.gov/firearms/docs/atf-national-firearms-act-handbook-chapter-3/download at 25; *see also* 27 CFR 479.103

file ATF Forms 4, Application for Tax Paid Transfer and Registration of a Firearm, to register the firearm to the transferee and pay the applicable transfer tax.[21] For transfers by FFLS/SOT's to other FFLs/SOTs, transfers must file ATF Forms 3, Application for Tax-Exempt Transfer of Firearm and Registration to Special Occupational Taxpayer, to register the firearm to the transferee.[22]

Firearms not lawfully registered as required by the NFA may not be registered and legitimized by their possessors. They are contraband and unlawful to possess.[23]

**IV**.

Defendant's motion for specific performance begins with a 10-page factual recitation of the back and forth negotiations between defense counsel and the government concerning the so-called "polygraph for pre-trial diversion agreement." This discussion continued in his reply brief. Defendant assumes, with no support, that his "polygraph for pre-trial diversion" agreement is enforceable. In the 2-page analysis portion of his 15-page brief, Defendant makes three perfunctory arguments as to the enforceability of the agreement.

First, he argues that: "Plea agreements are contractual in nature, and Courts reviewing alleged breaches of such agreements typically apply traditional rules of contract law in interpreting and enforcing them." Mot. at 13 (citing *United States v. Lukse*, 286 F.3d 906, 909 (6th Cir. 2002). Notably, however, Defendant did not enter into a *plea* agreement with the government. Defendant did not plead guilty, nor did he agree to plea guilty, nor did any of the back and forth negotiations even contemplate a guilty plea on his part. Indeed, the opposite of true. The goal of the negotiations

---

[21] https://www.atf.gov/firearms/docs/atf-national-firearms-act-handbook-chapter-3/download at 25*Id.*; *see also* 26 U.S.C. 5812(a); 27 CFR 479.84
[22] https://www.atf.gov/firearms/docs/atf-national-firearms-act-handbook-chapter-3/download at 25 at 26; *see also* 26 U.S.C. 5812(a); 27 CFR 479.88
[23] *U.S. v. Freed*, 401 U.S. 601 (1971)

was to avoid a guilty plea and agree to a pre-trial diversion. The law governing the enforceability of a plea agreement is inapposite. Defendant has made no factual admission and relinquished no rights. He retains his right to a jury trial and to be presumed innocent until proven guilty beyond a reasonable doubt. Even if the law governing plea agreements had any relevance here, it is well established that, absent detrimental reliance by the Defendant, either party can withdraw from a plea agreement until Defendant pleads guilty and the court accepts the plea. *See United States v. Rucker*, 133 F. App'x 187, 191 (6th Cir. 2005) ("A plea agreement is not executed until the court has accepted it.").

Defendant's second argument is that the government breached its promise not to use any of the information obtained during his proffer interview for any purpose other than the polygraph. Defendant contends that the government used the information obtained to support its motion in limine. Defendant also argues that the government obtained his participation in the proffer interview in bad faith because, as of the day of the interview, the government allegedly had no intention of allowing him to take a polygraph and obtain a pre-trial diversion. Even if this is true, Defendant does not explain why this would entitle him to have the underlying "polygraph-for-pretrial diversion agreement" enforced. The correct remedy under Federal Rule of Evidence 410 would be exclusion of the information obtained during the plea discussions.

However, Defendant's argument that the government improperly learned of his entrapment by estoppel defense for the first time during his proffer interview is a non-starter. As will be explained below, he is required by Federal Rule of Criminal Procedure 12.3 to notify the government and the court of his intention to pursue this defense. The government will be precluded from using of any other information obtained during the proffer or obtained during plea

negotiations generally. Thus, Defendant will be no worse for wear, and will be returned to the *status quo ante*; he will be in the same position he was in prior to submitting to the proffer.

Finally, Defendant argues that the government had no valid reason for withdrawing from the agreement. He argues that he was truthful during his proffer, that a truthful proffer was not a condition precedent to the agreement, and that the condition would be unenforceable even if it existed. Defendant also argues that there was no condition precedent that he refrain from conducting his own private polygraph examination, and that doing so in no way undercuts the validity of a subsequent government administered polygraph. Irrespective of whether the government had a sound or sensible reason for withdrawing from the agreement, the government's motivations for doing so are not relevant. The Defendant provides no support for his contention that the agreement is enforceable. Accordingly, the motion for specific performance will be denied

**III**.

A motion in limine is "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013). A motion in limine is not, however, "a proper procedural device[] for the wholesale disposition of theories or defenses." *Id.* Although the government's motion purports to seek the exclusion of "evidence," it scarcely identifies any pieces of "evidence" that are potentially excludable.

In reality, the motion asks the Court to preclude Defendant from raising any defense that would "suggest to the jury that Brandon Putman was acting lawfully with regards to the auto sear . . ." The government has the burden to prove that Defendant acted knowingly. This burden would not be particularly meaningful if the Defendant was precluded from contesting the knowledge

requirement. Generally speaking, evidentiary rules cannot be applied so as to prevent a defendant from presenting his defense. *Chambers v. Mississippi*, 410 U.S. 284 (1972).

The government's motion also treats "entrapment-by-estoppel" as indistinguishable from a run-of-the-mill mistake of law defense. Based on the Court's limited understanding of Defendant's defense theory, the Court is under the impression that Defendant intends to assert that he relied on an incorrect representation from an ATF official as to the lawfulness of his conduct. It is unclear why the government regards this as identical to an ordinary mistake-of-law defense.

As to the facts supporting the defense, the Court has very little information, if any. Defendant submitted a *Touhy* request, which the government opposed on the grounds that much of the information requested had already been provided, or that the government was aware of no obligation to produce the information. The government also indicated that it would not make further document productions while the motion in limine is pending.

In its reply brief, the government directed its attention exclusively to the "entrapment-by-estoppel" defense, and no longer maintains that Defendant ought to be precluded from challenging his criminal intent generally. ECF No. 71. As to the entrapment-by-estoppel defense, the government contends that it has been waived under Federal Rule of Criminal Procedure 12.3 because Defendant has not filed and served a notice of his intent to assert the defense within the time required by the rule. Although Rule 12.3 is not expressly applicable to an entrapment-by-estoppel defense, the Sixth Circuit has extended the rule to that defense. *See United States v. Theunick*, 651 F.3d 578, 590 (6th Cir. 2011). The rule requires a defendant to file and serve a notice containing: a) the law enforcement agency or federal intelligence agency involved; b) the

requirement. Generally speaking, evidentiary rules cannot be applied so as to prevent a defendant from presenting his defense. *Chambers v. Mississippi*, 410 U.S. 284 (1972).

The government's motion also treats "entrapment-by-estoppel" as indistinguishable from a run-of-the-mill mistake of law defense. Based on the Court's limited understanding of Defendant's defense theory, the Court is under the impression that Defendant intends to assert that he relied on an incorrect representation from an ATF official as to the lawfulness of his conduct. It is unclear why the government regards this as identical to an ordinary mistake-of-law defense.

As to the facts supporting the defense, the Court has very little information, if any. Defendant submitted a *Touhy* request, which the government opposed on the grounds that much of the information requested had already been provided, or that the government was aware of no obligation to produce the information. The government also indicated that it would not make further document productions while the motion in limine is pending.

In its reply brief, the government directed its attention exclusively to the "entrapment-by-estoppel" defense, and no longer maintains that Defendant ought to be precluded from challenging his criminal intent generally. ECF No. 71. As to the entrapment-by-estoppel defense, the government contends that it has been waived under Federal Rule of Criminal Procedure 12.3 because Defendant has not filed and served a notice of his intent to assert the defense within the time required by the rule. Although Rule 12.3 is not expressly applicable to an entrapment-by-estoppel defense, the Sixth Circuit has extended the rule to that defense. *See United States v. Theunick*, 651 F.3d 578, 590 (6th Cir. 2011). The rule requires a defendant to file and serve a notice containing: a) the law enforcement agency or federal intelligence agency involved; b) the

agency member on whose behalf[24] the defendant claims to have acted; and c) the time during which the defendant claims to have acted with public authority.

The government also argues that the defense of entrapment by estoppel is also legally insufficient. The government argues that Defendant has only argued that he was led to believe he was covered by Ephesians 610 LLC's FFL. The government argues that even if he was covered by that FFL, he still could not lawfully possess the auto-sear which was unregistered and did not bear a serial number.

In short, the government's reply brief raises a number of arguments not raised in the motion. As Defendant has not had a chance to respond to these arguments, he will be permitted to file a surreply.

V.

Accordingly, it is **ORDERED** that the Defendant's motion for specific performance, ECF No. 64, is **DENIED**.

It is further **ORDERED** that Defendant's surreply to the Government's motion in limine, ECF No. 63, is due on or before **May 31, 2019**.

Dated: May 20, 2019    s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

---

[24] The language of the rule here is not directly applicable, as Defendant does not contend he was acting "on behalf" of a public official. The Sixth Circuit has interpreted this to require a defendant to disclose the name of the agent or official whose representation the defendant allegedly relied upon. *Id.*